242    THAYER vs. NAT'L. REAL ESTATE TRUST CO.

Syllabus

HORACE H. THAYER, JR.,

vs.

NATIONAL REAL ESTATE TRUST COMPANY.

*New Castle, Feb. 27, 1914.*

The charter of a trust company provided that all moneys deposited in its "thrift department" should be kept separate and apart from all other funds, should be invested only in first real estate mortgages, and should be used only in fulfilling "thrift department" contracts with depositors whose certificates referred to such charter provisions. *Held*, that the obligation to keep the fund intact created a trust in favor of the certificate holders, and they alone were entitled to share in the fund upon the insolvency of the company.

Under a provision of such contracts, deposits made by a certificate holder might be forfeited by a default in weekly payments continuing for five weeks. *Held*, that some affirmative action by the trust company was required to declare the default; otherwise delinquent certificate holders were entitled to share in the funds.

Under a provision of such contracts, a certificate holder even after default could be automatically reinstated in good standing by resuming payments within three months; *held*, that all certificate holders delinquent in payments for less than three months prior to the receivership were entitled to share in the fund.

Where such trust company exercised its right to declare forfeitures of moneys paid by delinquent certificate holders, such action was final, and precluded such certificate holders from claiming any share of the thrift fund.

Whenever the trust company failed to terminate a contract by declaring a default, the certificate remained in force, and the holder thereof retained his interest in the fund no matter how long the period of his delinquency.

The action of a trust company and its records disclosing active certificates and certificates which had been terminated under a contract permitting the trust company to declare a forfeiture are the best evidence of the right of certificate holders to participate in the trust fund after the insolvency of such trust company.

Where default had been declared and the defaulter's money forfeited if the defaulter was thereafter reinstated, it was the duty of the trust company to restore to the thrift fund the money so forfeited.

In the case of certificate holders who borrowed money from the fund, *held*, that interest should be charged against them to date of the receivership.

After paying the expenses of administration to the amount of the fund should be added·the aggregate sum of all moneys borrowed by certificate holders, and the total will be the fund for distribution to be divided among the claimants in proportion to the amount of each claim, and from the sum due each claimant should be deducted the amount of any loan made from the fund, together with interest thereon.

Certificates which were improperly or irregularly rescinded prior to the lapse of the requisite time are entitled to share in such trust fund.

Where the certificate holders paid installments in advance of the last due date prior to receivership, the money so paid should be refunded them before distributing the fund.

Where such certificate holders have made loans from the fund, the amount of their old payments should be credited on such loans.

The holder of a "full-paid" certificate, while entitled to participate in the fund, has no right of priority over other certificate holders.

Since the thrift fund is inadequate to pay all certificate holders in full, any moneys collected by the receivers from other sources should be treated as part of such fund because of the trust company's obligation to keep that fund intact.

EXCEPTIONS TO CLAIMS.   The company was organized, among other things, to carry on a plan of receiving deposits for accumulation.   Its charter provided for the operation of a "thrift department" in the following language:

"All moneys received by the company in the 'thrift department' shall be set aside and kept separate and apart from all other funds of the company and shall be invested only in first mortgages on real estate * * * and shall not be used for any purpose whatever except for the purpose of fulfilling the contracts of the company in said 'thrift department,' except that whenever any contract made in said 'thrift department' shall be charged with a fine, forfeiture or breach under the terms thereof, the amount of said fine, the amount forfeited or the amount of damages ascertained for said breach may be withdrawn from the fund and set aside and held by the 'thrift department' and deposited with the general funds of the company.   * * * * "

The company issued to applicants what was called an "instalment first mortgage certificate," whereby it agreed to pay to the holder a certain sum on a certain date, upon condition that the holder would "advance" to the company a certain sum of money on Monday of each week for twelve years and until six hundred and twenty-four such advancements had been made to the company. Other relevant terms and conditions of the certificate are as follows:

"2.  *Suspension of Payments*—After the holder hereof shall have advanced thirteen instalments as above provided for, the company agrees to waive the time of advancements provided for hereunder for a term of not less than two months nor more than six months, at any one time, provided the holder hereof makes application for such waiver in writing in form prescribed by the company and presents his receipt book and certificate for indorsement before any breach of terms of this contract by said holder.

"3.  *Forfeiture and Reinstatement*—Should the holder hereof fail for five weeks to advance to the company the instalments hereinabove provided, this contract shall be considered to have been rescinded by him, and the amount advanced hereon by said holder shall be and the same is hereby agreed upon to be the amount of liquidated damages due the said company because of said breach and recision. It is further agreed, however, by the company that should the holder hereof within three months from the date of the advancement of the last instalment due and paid as herein provided resume the payments of the instalments provided for herein the company will waive the recision aforesaid and the liquidated damages herein provided for and treat the time of payment of said instalments as having been waived. * * *

"8.  *Security*—The funds received from certificate holders shall be invested in first mortgages on improved real estate or in collateral loans, to certificate holders in accordance with the terms of its certificate of incorporation as it refers to the thrift department wherein it is required that all moneys received from certificate holders shall be kept separate and apart from all other funds of the company in a reserve fund to which the interest at the rate of 4% per annum shall be added. The principal and interest as above stated must always remain intact until the amount is withdrawn by the certificate holder or his certificate rescinded. Should the funds so set aside and invested, through loss, depreciation, or otherwise, be less than the amount required to enable the company to meet its obligations to its certificate holders, the deficiency shall be immediately repaired from the general funds of the company. It is also especially provided that under no circumstances shall loans be made to any of the

company's officers, directors or employees. All investments shall be made subject to the approval of the board of directors or the investment committee of the company. The books and accounts of the company will be regularly examined by an auditing committee appointed by the board of directors."

Numerous certificates of this character were issued by the company and many loans were made to holders of the certificates.    Collections were made by agents.

On May 16, 1912, the company being insolvent, Peter T. Wright was appointed receiver and seven hundred and ninety-five claims have been filed with the Register in Chancery by holders of these certificates. The receiver and his counsel classified the claims, and by exceptions raised certain general questions respecting almost all of the claims, and particular questions as to many claims.   These exceptions were, on March 8, 1913, referred to Henry R. Isaacs, Esquire, as Master, to report his findings thereon and what claims should be allowed and what disallowed, and to classify them according to the facts found by him.

After giving notice to all persons to whose claims exceptions had been filed, and having had numerous hearings, the Master made his report to the Chancellor on July 17, 1913. In his report he classified the claims into fourteen schedules, and made specific reports as to a large number of claims where the circumstances were unusual.   The schedules are these:

"Schedule 1.   Claims of certificate holders who have paid instalments on their certificates within five weeks prior to May 13, 1912.

"Schedule 2.   Claims of certificate holders who have paid instalments on their certificates in advance of May 13, 1912.

"Schedule 3.   Claims of certificate holders who have failed to make payments of instalments on their certificates within five weeks prior to May 13, 1912, but have made payments thereon within three months prior to May 13, 1912.

"Schedule 4.   Claims of certificate holders who have procured collateral loans from the company and have paid instalments either in repayment of the loans or on their certificates within five weeks prior to May 13, 1912.

"Schedule 5.   Claims of certificate holders who have procured collateral loans from the company and have continued to pay on their

certificates, and, in fact, have paid instalments thereon in advance of May 13, 1912.

"Schedule 6. Claims of certificate holders who have procured collateral loans and have failed to make payment of instalments either in repayment of the loans, or on their certificates, within five weeks prior to May 13, 1912, but have made payments either in repayment of the loans or on their certificates within three months prior to May 13, 1912.

"Schedule 7. Claims of certificate holders who have paid instalments on their certificates within five weeks prior to May 13, 1912, but have withdrawn part of the money paid in.

"Schedule 8. Claims of certificate holders who have failed to pay instalments on their certificates within three months prior to May 13, 1912, but have made payments thereon within six months prior to May 13, 1912.

"Schedule 9. Claims of certificate holders who have failed to pay instalments on their certificates within six months prior to May 13, 1912, but have made payments thereon within one year prior to May 13, 1912.

"Schedule 10. Claims of certificate holders who have failed to pay any instalments on their certificates for more than one year prior to May 13, 1912.

"Schedule 11. Claims of certificate holders who have procured collateral loans from the company and have failed to make payments of instalments either in repayment of the loans, or on their certificates, within three months prior to May 13, 1912, but have made payments either in repayment of the loans, or on their certificates, within six months prior to May 13, 1912.

"Schedule 12. Claims of certificate holders who have procured collateral loans from the company and have failed to make payments of instalments either in repayment of the loans, or on their certificates, within six months prior to May 13, 1912, but have made payments either in repayment of the loans, or on their certificates, within one year prior to May 13, 1913.

"Schedule 13. Claims of certificate holders who have procured collateral loans from the company and have failed to make payment of any instalment, either in repayment of the collateral loans, or on their certificates, for more than one year prior to May 13, 1912.

"Schedule 14. Miscellaneous claims."

In his report, the Master fixed Monday, May 13, 1912, as the last date from which the period of five weeks mentioned in paragraph three of the contract should be calculated, because that was the last Monday preceding the appointment of the receiver on Wednesday, May 16, 1912, the payments on the

certificate being due on each Monday. The receiver had divided the claims into nine classes, based on the dates on which the last payments were due; but later, the receiver withdrew from this position and stated to the Master that in his opinion an acceptance by the company of payment within five weeks of default amounted to a waiver by the company of the default. This means that notwithstanding a payment was due for more than five weeks prior to May 12, 1912, the receipt of a payment within five weeks waived the forfeiture, if there was one, under paragraph three of the contract. It was still urged by the receiver that the holders of thrift certificates were not entitled to priority or preference of payment over the general creditors of the company.

It was reported by the Master that the company kept two files, one of live certificates and the other of lapsed certificates. Each customer's account was entered on a card showing dates and amounts of payments. At irregular intervals the officer of the company in charge of the department listed the names of those five weeks, or more, in default, changed their cards from the file of live certificates to the file of lapsed certificates, and under the authority of paragraph three of the contract and section eight of the charter, withdrew from the "thrift fund" the aggregate amount of the payments on the several lapsed certificates and applied the money to the general purposes of the company. In many cases such defaulters resumed payments after their certificates had been lapsed, and in such cases their cards were restored to the file of live certificates, even though the resumption of payments may have been more than three months after default. It was the policy of the company to receive payments from holders of certificates at any time, whatever the cause of default may have been.

Again the Master found "that the agents and officers of the company gave the claimants to understand that failure to pay would not entail upon them a loss, or forfeiture, of the money advanced to the company, but would only affect the period of maturity of their certificates." From the testimony of the treasurer of the company it appeared that the company considered that it was liable to all holders of certificates whose

cards were in the file of live certificates.   There are in the file
of lapsed certificates kept by the company the cards of one hun-
dred and ten claimants.   While not distinctly directed to
state his conclusions of law, the Master expresses his general
view as to the important effect of the two files thus:

"If the receiver is exactly in the shoes of the defendant company,
and cannot set up a forfeiture where the company acknowledged liability,
it would seem difficult to justify the receiver's denial of the rights of
claimants under certificates, the company's records of which are in the
'live file.'   Indeed, had it not been for the limitations placed upon the
Master by this reference, he would have been constrained, in view of the
testimony of Mr. Thayer, to broadly divide the claims filed into two
classes, including in one class all claims under certificates the company's
records of which appear in the 'lapsed file,' and in the other class, all other
claims."

The learned Master, in order to be of service to the Chan-
cellor, thus summarized the questions of law for determination:

"1.   The most important question is, whether, or not, the rights of
any of the claimants have been terminated because of failure to pay instal-
ments on their certificates, or in repayment of loans, for a period of time.

"2.   The second question is, whether, or not, those claimants whose
claims are found to be valid are entitled to a preference in the distribution
of the assets of the company.   The determination of this question will
largely be governed by paragraph eight of the terms and conditions of
the contract between the claimants and the company, and probably to
some extent controlled by the testimony of Horace H. Thayer, Jr.   *   *   *

"3.   Where payments have been made in advance of the appointment
of the receiver, are the claimants entitled to have the full amount of the
advanced payments deducted from the amount paid in and later added to
the dividend declared upon the balance, or does the fact that payments
have been made in advance merit no special attention?   In case of loans,
may the total amount of advances be applied upon the loans and adjust-
ment of the accounts be then made?

"4.   In those cases where unpaid loans are found to exist, shall
adjustment of the accounts of the claimants be first made, and dividends
declared upon the balance found to be due, or shall dividends be calculated
upon the basis of the amounts paid in and adjustment of the accounts be
then made?

"5.   In the event of your Honor's disallowance of claims in connec-
tion with which unpaid loans exist, do these loans constitute a legally
binding obligation upon the claimants who have borrowed?"

Subject to the determination of these questions, the Master recommends the allowance of all the claims.

The exceptions and the points of law raised by the Master's report were heard by the Chancellor, and argument made thereon by solicitors representing claimants.

*William F. Kurtz* and *Caleb E. Burchenal*, solicitors for claimants of various classes, urged (1) that the holders of the certificates were entitled to priority and preference of payment over general creditors of the company, because the "thrift fund" was a trust fund; (2) that the third paragraph of the contract was a penalty and not a forfeiture; and (3) that even if it be a forfeiture the company, by its general policy, had declared its intention to waive the right to claim any forfeiture for defaults.

*Walter J. Willis*, solicitor for other claimants, who were not in default at all, urged that preference be given to holders of certificates over general creditors, but that this right was limited to those not in default, and that those who had ever defaulted were ineligible to reinstatement. His argument on this latter point is thus stated in one part of his brief:

"There was a mutual, implied obligation or agreement that they would all abide by the terms of the contracts.

"By taking off forfeitures and granting waivers, where not provided in the contracts, it encouraged defaulters and put a premium on neglect. The waivers of defaults lessened the company's ability to pay the four per cent. and the bonus promised the depositors. The reinstatement of the defaulters was to the detriment of those who fulfilled their contracts. Under the implied agreement among the depositors that the defaults should go to the company, it was not in keeping with good faith that the defaulters should ask and receive back from the company what they had lost by their defaults and what had become the property of the company unless the company was fully able to make good its agreement with the depositors in good standing.

"Many of those who are now claiming a share of the fund now in the hands of the receiver are defaulters who would never have renewed their deposits with the company."

He further contended that the company had no right to

withdraw moneys from the "thrift fund" unless there was enough in that fund to pay the non-defaulters and that the company could not reinstate a defaulter after his money had been forfeited to the company, if by such reinstatement the "thrift fund" would not be sufficient to protect the non-defaulters.

THE CHANCELLOR. The court is called upon in this case to decide who are entitled to participate in the distribution of the assets of this insolvent corporation. Practically all the moneys obtained by the receiver were derived from the "thrift department" and are, therefore, moneys paid into that fund by holders of thrift certificates, or as they are more correctly called the instalment first mortgage certificates. Both by the charter of the company and the certificates issued by the company, the company was obliged to set aside and keep separate and apart from other moneys of the company, the sums paid by holders of these certificates, and could not use such money for any other purpose than the fulfillment of the contracts of the company in the "thrift department," subject, of course, to the right of the company expressly stated in the charter, to withdraw from the fund amounts forfeited for the defaults of certificate holders. This obligation of the company to keep this fund intact impresses the fund with a trust in favor of the holders of thrift certificates, and none others are entitled to participate in a distribution thereof. It matters not that the payments are called "advances," or even loans to the company. They were payments made weekly by numerous persons into a common fund to be invested by the company for the benefit of those who contributed to it. General creditors have no cause of complaint, because they had full notice of all the conditions and methods of operation as shown by the charter, whereby the company undertook to receive from numerous persons small sums and invest the aggregate amount for the benefit of those who so paid. That this money belongs only to the holders of thrift certificates is conceded by all who have appeared by counsel in the cause. The real difficulty arises as to who of the holders of thrift certificates are entitled to the fund.

Under the third clause of the contract contained in the certificates, moneys paid by a certificate holder might have been forfeited in cases of defaults for five weeks. This was a privilege of the company and required some affirmative action on its part, for a forfeiture did not result automatically from default in making payments. Whether the company had declared a forfeiture, or not, the certificate holder had a right to resume payments within three months from the date of the last payment, and if he so resumed he was automatically reinstated as a certificate holder in good standing. As he had a right to resume, a tender of money would be as effective as an actual payment. This interpretation is drawn from the agreement to waive a recision, and treat the requirement fixing time of payment as having been waived, in case of a resumption of payment within three months. The policy and practice of the company accorded with this interpretation, for holders of certificates were encouraged and invited to resume payments even after the lapse of more than three months, and, indeed, at any time however long the period of suspension.

It is difficult to reconcile paragraphs two and three, and the above interpretation of paragraph three is adopted independent of paragraph two. It is adopted as being the fairest and most liberal to the defaulters and without injustice to any non-defaulters. If a certificate holder had been reinstated by resumption of payments and subsequently for another period of three or more months there had been a suspension of payment by the certificate holder, the company might then have terminated the agreement and the holder have been entirely shut out. The company could waive the right to rescind for non-payments. It could also rescind for defaults, and did, in fact, frequently exercise this right by declaring numerous certificates to have been lapsed, meaning thereby forfeited. It kept two files, one containing the live certificates and the other the lapsed certificates. Whenever it rightly exercised the privilege of terminating a contract on account of default, its action was final; and whenever it did not do so, the certificate was in force notwithstanding a suspension of payments and however long the period of suspension. In-

action of the company kept alive certificates however long the defaults.

To determine what certificates are in force and, therefore, entitled to participate in a division of the "thrift fund," the action of the company must be considered, and the two files kept by the company and the books and records of the company are the best evidences of the attitude of the company towards the individual certificate holders. This was the view of the Master. It presents a clear and logical test. This view is not unjust or injurious to those certificate holders who have not defaulted at all, or who have resumed payments after defaults. The contrary is urged by the solicitor who represented those not in default. It is said by him that the fund for distribution is insufficient to pay in full all those not in default, and so those who have not kept their agreement to pay instalments regularly should not participate in the distribution and so thereby decrease the amount available for payment of the claims of those who have kept their contracts with the company. Another reason for this view is the practice of the company to withdraw from the "thrift fund" moneys paid into it by defaulters, this being done when the certificates were declared lapsed. But these reasons are not convincing. The company had a right to withdraw from the "thrift fund" moneys paid in by defaulters and use such moneys for the general purposes of the company. This was part of the agreement between the company and the holders of its certificates, and non-defaulters had no right to object to such withdrawals, or to the uses made by the company of moneys so withdrawn. If a defaulter be reinstated by resumption of payment after the moneys had been withdrawn by the company from the fund, then it was the duty of the company to restore to the fund the amount so withdrawn.

As the result of a special inquiry made of the Master upon a re-reference to him, it appears from his supplemental report, that the sums of money paid into the "thrift department," and which sums were subsequently at various times withdrawn therefrom by the company by reason of the failure of holders of certificates to continue payments thereon, were all restored

to the "thrift fund" in cases where defaulting certificate holders resumed payment. In other words, when a defaulter resumed payment the company, as in duty bound, restored to the "thrift fund" all moneys which it had previously rightly withdrawn from that fund.

This supplemental report also makes it clear that none of the moneys which were paid into the "thrift fund" were removed therefrom illegally, and that the reason why the "thrift fund" is not now sufficient to pay in full all the claims of holders of· certificates in good standing is unimportant in deciding to whom the money in hand for division belongs.

Non-defaulters have no right to complain that the company reinstated any defaulter, provided it refunded to the "thrift fund" all moneys withdrawn from it by reason of a default, and, as appears above, it did so refund. If there had been no withdrawal of money paid in by a defaulter, then a reinstatement could do no injury to non-defaulters, because in case of a recision for default the moneys paid in by a defaulter would have belonged to the company and not to those holders of certificates who had not defaulted. It is true, every reinstatement increased the number of participants in the present distribution; but the right to rescind belonged to the company and not to certificate holders; and the moneys of defaulters belonged to the company, and not to non-defaulters. So in either aspect there is no injustice done by reinstatements.

So, too, every one whose certificate has been rescinded by the company, or by it declared to have "lapsed," is excluded from having a share of the "thrift fund," provided he made default for more than three months prior to the appointment of the receiver. The company had a right to rescind after five weeks' default, but must reinstate a defaulter upon resumption within three months. Therefore, three months of grace should be allowed within which a resumption could be had. The receiver was appointed May 16, 1912.

The conclusion of the matter, then, is this: Those holders of certificates whose certificates were treated by the company as alive are allowed to participate in the distribution, whether in default or not, and however long the default in making pay-

ments may have continued; and those holders of certificates whose certificates were treated as rescinded, or lapsed, will not so participate, provided they be in default for more than three months before the appointment of the receiver, *i. e.*, prior to February 12, 1912. The Master has reported schedules of the certificates classified in this way, one containing the names of those whose certificates were treated by the company as live and the other those whose certificates were treated as lapsed.

It remains to consider the rights and responsibilities of those claimants who have borrowed moneys from the company, based on their payments to the company as holders of thrift certificates. About one hundred holders of such certificates borrowed money from the "thrift department," the aggregate thereof being about twenty-five hundred dollars. Concerning them the following questions arise: (1) To what time should interest be charged against them? Clearly to the date of the receivership and not later. (2) How should their shares be calculated? After collecting all the assets of the company and paying the costs of administration, the net amount for distribution will be then ascertained. Then add to this amount every sum borrowed by certificate holders who have proved their claims, and whose certificates have not been lapsed by the company, with interest thereon. This latter sum is the one for division. Then, having ascertained the aggregate amount of those entitled to participate in the fund, the percentage of the amount applicable to each certificate will be calculated. From the amount due each claimant, based on this percentage, deduct the amount due from him on account of the loan made to him and interest. In brief; add to the net fund for distribution all the moneys due from all those who have borrowed from the "thrift fund," principal and interest to the date of the receivership, and having ascertained the percentage due to the claimants deduct from each claimant the amount of principal and interest due from him.

From an examination of the schedule of lapsed certificates it appears that several certificates were irregularly rescinded. For instance, the certificate of Edward Campbell had been declared "lapsed," or rescinded, on May 15, 1912, though he

had made a payment within five weeks of the date of such recision. His claim should not be disallowed if objection be made thereto based on lapsing or attempted recision. This same principle applies to the claims filed by William H. Dutton and Pearl M. Ford, respectively.

Schedule two of the Master's report includes claims of persons, holders of certificates, who have paid instalments on their certificates in advance of May 13, 1912, which date was the Monday next before the appointment of the receiver. They are, of course, all entitled to participate. The Master properly raised the question whether the amounts so paid in advance, which to that extent constitute overpayment, should be repaid in full to those persons named in the schedule, treating the overpayments as being entitled to priority. This question was not discussed by counsel, and there is nothing in the certificates, or on the record that throws any light upon the subject; but it seems manifestly just and fair that those who have overpaid and thereby made a greater contribution to the "thrift fund" than they need have done—and would not have done had they anticipated the collapse of the company— should be reimbursed in full. These overpayments, therefore, will be allowed and an order will be made for their payment before distribution of the fund is made.

Schedule five in the Master's original report includes the names of certificate holders who have procured collateral loans from the company and have continued to pay on their certificates, and in fact have paid instalment thereon in advance of May 13, 1912. For the reasons above stated concerning those in schedule two, the amounts overpaid should be credited to the certificate holders so overpaying, and inasmuch as they have all borrowed money from the company, the amounts of the overpayments will be credited as a payment on account of the loans. It has already been explained hereinabove how the certificate holders who have obtained collateral loans are to be treated in the distribution, and the same principle, of course, applies to those in this schedule, after their overpayments have been credited on the amounts borrowed by them.

The claim of the administrator of John Eves is based on a certain promise in writing, made by the company, called a "full paid 5 per cent. first mortgage participating certificate," dated February 4, 1909. By it the company agreed to pay John Eves six hundred and thirty dollars on February 4, 1914, with interest at five per cent. per annum, and the claim is for six hundred and thirty dollars with interest from February 4, 1912. The administrator also claims a preference in the distribution. It is not clear upon what matter the claim for preference is based, either from anything in the instrument itself, or from any fact stated or argument advanced. Without specifically referring to the terms of the contract, it does appear by a reasonably fair inference that the holder of the certificate could look to the "thrift fund" for payment of the amount due him. The references to the "thrift fund," and the source and object of it, can mean only this, and no other explanation of those references is necessary. It is clear, however, that there is nothing in the contract which gives any priority of payment to the holder of this certificate over those persons who have contributed to the "thrift fund" and are entitled to participate in the distribution thereof, and no reason is urged, or appears, for such a claim of preference or priority. This claim will receive its proportionate share of the assets distributed. Interest will be allowed on the claim down to the same date as is allowed to other claimants against the "thrift fund."

On the general subject of allowing interest on the claims filed, it is sufficient to say that as there are no priorities and as the fund for distribution is insufficient to pay the principal of the claims in full, it is immaterial whether interest be allowed and added to the claims, or not. The only result of so adding to the amount of the claims would be to reduce the percentage applicable to the claims without increasing the net result to those among whom the distribution is made.

The foregoing conclusions are based on the assumption that the moneys for distribution came from the "thrift fund." If, on the other hand the receiver has collected moneys from any other sources, the amount so received should be treated as

part of the "thrift fund," because of the obligation of the company under its contracts with the certificate holders to maintain the "thrift fund" intact. Of course, even the "thrift fund" must be subject to deduction for costs of the receivership.

Let an order be entered accordingly.