WILLIAM F. FELL,

*vs.*

SECURITIES COMPANY OF NORTH AMERICA.

In the Matter of the Petition of HARRIET H. D'OLIER.

*New Castle, July* 29, 1915.

A company organized to invest individual savings issued cumulative bonds requiring a specified number of monthly payments, after which it agreed to pay the holder a specified sum of money, together with the bond's share of the accumulations in its profit fund, to be not less than three per cent. upon the installments paid and to arise from net gains from withdrawal discounts, transfer fees, fines, and forfeitures, net interest earnings in excess of three per cent. on the reserve, which consisted of such amounts apportioned from the payments as, together with interest at three per cent., compounded annually, would equal the guaranteed sum at maturity, and to loan the holder upon interest an amount determined by a table of values contained in the bond. A purchaser, or subscriber, made payments for ten years on the company's agreement to pay him $3,000 with accumulations, and thereafter borrowed $4,488 upon his note and the security of the bonds, which, with additions, were worth more than the debt. *Held* that, as all the bondholders, including those who had not borrowed from the company, had lost by its insolvency and receivership, the holder was not equitably entitled to set off his payments against the loan or the interest thereon, or to have the balance of his claim declared a debt against the company.

PETITION FOR SET-OFF. The Securities Company of North America was incorporated under the laws of this State in 1904 for the purpose of collecting and investing savings of individuals who desired to participate in the plans of the company, and engaged in business until August 25, 1915, when pursuant to action of two-thirds of all the stockholders it was dissolved, and on September 22, 1914, the Wilmington Trust Company was appointed receiver to wind up the affairs of said company.

While so engaged in business the company issued what was called "cumulative bonds," section one of the terms and

conditions of which required payments to be made monthly in advance, or, at the option of the holder, to be made quarterly, semi-annually, or annually, until a specified number of monthly payments were made, at the expiration of which time the company agreed to pay such holder a specified sum of money, together with the "bond's share of the accumulations then to its credit in the profit fund, to be not less than three per cent. per annum upon installments paid." If payments be made for twelve months the company agreed to loan the bondholder, with interest payable in advance at the rate of six per centum per annum, an amount specified in a "table of values," included in the bond. The other terms and conditions of the bond affecting the questions here raised are, as follows:

"Section 2. *Reserve.* The reserve maintained hereon, which belongs exclusively to this bond, shall consist of such amounts apportioned from the periodical payments hereon, as together with interest at the rate of three per cent. (3%) compounded annually, will equal the principal sum guaranteed at maturity.

"Section 3. *Profit Fund.* The profit fund arising from bonds of this class shall consist of all net gains from withdrawal discounts, transfer fees, fines and forfeitures, all net interest earnings in excess of three per cent. (3%) per annum on the reserve of said bonds, and all net interest earnings on said profit fund. Said profit fund shall belong exclusively to said bonds, and except as herein provided shall not be used for any other purpose whatever; and, as determined by the company, shall be distributed to said bonds at their maturity in accordance with their denominations."

Harriet H. D'Olier, the petitioner, became the purchaser of, or subscriber for, two of said bonds, obligating herself to pay installments of $25 monthly on each bond for 120 months, the company agreeing to pay her $3,000 at the expiration of that time, together with the accumulations as above stated. On February 2, 1914, the petitioner borrowed $4,488.17 from the company, gave her promissory note therefor, assigned her two bonds to the company as collateral security, paid interest on the amount borrowed to and including August 2, 1914, and after the appointment of the receiver filed her claim to participate in the distribution of the assets of the company based on

said bonds, and the receiver has demanded payment of the interest on the loan.

It is alleged in the petition that the value of the bonds and accumulations to their credit in the profit fund at the time of the appointment of the receiver, calculated on the basis of three per cent. per annum upon the installments paid, amounted to $6,192.44; and that the equitable value of said bonds, ascertained in accordance with the provisions of the terms and conditions of the bond under the title "Reserve," at the time of the appointment of the receiver, amounted to $5,337.74.

The prayers of the petition are that the sum of $6,192.44, or that the sum of $5,337.74, may be decreed to be due the petitioner and that whatever sum is so decreed may be decreed to be a set-off against the claim of the receiver on account of the loan and interest thereon from August 2, 1914, to the date of the appointment of the receiver on September 22, 1914; and that the balance of the claim filed by the petitioner may be determined to be a debt due the petitioner from the company.

The matter was heard on petition, no answer thereto having been filed by the receiver.

*Marvel, Marvel & Wolcott*, for the petitioner.
*Ward, Gray & Neary*, for the receiver.

THE CHANCELLOR. The petitioner as the holder of two of the cumulative bonds of the insolvent company seeks an application of the well-settled general principle of equitable set-off. The question, however, is as to the application of the principle here, for its applicability depends upon the facts in each case. Of the cases cited to support that principle, the decision of the Supreme Court of the United States in *Carr v. Hamilton*, 129 *U. S.* 252, 256, 262, is the closest. Hamilton had an endowment policy, payable at a certain time at all events, or sooner in case of his death, and by it the insured agreed to pay ten yearly premiums. He afterwards borrowed money from the insurer, as he had a right to do as the holder of the policy and which he would not have done had he not been the holder thereof. To secure the loan he gave a note

and mortgage on real estate. Later and before the policy was payable the insurance company failed and went into the hands of a liquidator, at that time the equitable value of the policy exceeded the amount due on the loan. *Held*, that Hamilton was entitled to set-off against the debt due from him to the company this equitable value, though it was not then payable. The court said that by the insolvency proceedings the company was *civiliter mortuus*, and holders of its policies were entitled to the equitable value of their policies and to participate *pro rata* in its assets. The court said:

"If any one is indebted to the company, especially if his debt was contracted with reference to, and because of, his holding a policy, there would seem to be strong reason for allowing him a set-off, and no good reason to the contrary.

"We are inclined to the view that where a holder of a life policy borrows money, of his insurer, it will be presumed, *prima facie*, that he does so on the faith of the insurance and in expectation of possibly meeting his own obligation to the company by that of the company to him, and that the case is one of mutual credit, and entitled to the privilege of compensation or set-off whenever the mutual liquidation of the demands is judicially decreed on the insolvency of the company."

In the cited case the principle was properly applied, for the holder of the policy of insurance made by the company borrowed money from the company with reference to and because he held the policy, and had a right under its terms to borrow the money from it.

A holder of the instruments called "cumulative bonds" also borrowed money from the maker of the bonds with reference to and because she held the bonds, and so had a right to borrow money from the obligor. If those were all the facts, then great weight should necessarily be given to the view of the Supreme Court of the United States. But there are certain features of the bonds which make the principle there stated inapplicable here, and brings the case within the control of recent decisions in the courts of Delaware, to be hereafter referred to. The bonds in question are two of a large number of similar bonds made by the same company and held by persons

who have proved them in this receivership cause. While called a "cumulative bond," the instrument is really a contract, the principal features of which pertinent to this issue are these: Each bondholder agreed to make to the company a certain number of monthly payments, extending over a certain period of time, and the company agreed to pay, at the expiration of the period, to the holder, a certain sum, and in addition a share of a certain fund to be accumulated by the company, called the "profit fund." This profit fund by the contract consisted of accumulations from several sources: (1) The discounts retained by the company from the amounts payable to the holders of any of the bonds who withdrew from the company, the withdrawal values being less than the amount due; (2) fees for transferring bonds; (3) the fines which by the contract the company could impose at a fixed rate upon those who failed to make payment on the bond when due; (4) the sums forfeited by those who remain for a certain period in default in making payments; (5) net interest in excess of three per cent. received by the company on investments made of moneys paid in by the bondholders, the three per cent. being placed in the "reserve fund"; (6) all net earnings on the investment made of moneys paid into the profit fund. This fund the company, by the contract, agreed to distribute to the bondholders at their maturity. It was also in the contract that the company, upon an assignment to it of the bonds as security, would loan money to the holders of the bonds certain amounts, therein stated, according to the number of payments made by the bondholders.

In brief, each bondholder made fixed payments for a fixed period, at the expiration of which the company should pay a fixed sum, together with a proportionate part of a fund, uncertain in amount, made up of several items of receipts from all or any of the other bondholders who were in default, or who withdrew, as well as from the investments made by the company of all the payments by all the bondholders. This profit fund was like a pot into which all these gains and profits were thrown for the common benefit of all who continued to pay to maturity all the sums they agreed to pay by the contract.

The pot was maintained by each for all, and because the amount contained therein for division among those who paid to the end was uncertain, there were risks and the profitableness of the contracts was likewise uncertain. When the company which issued the bonds became insolvent, or unable to carry out the plan of the bonds, the profit fund was affected. Some of the bondholders borrowed money from the company and some did not. All have suffered loss by the receivership. The question is: Should those who have not borrowed be put in a worse position because others have in advance of maturity of the bonds received from the company by way of loan a part of the money they had paid in?

It is not possible to distinguish the status of the holders of these bonds from that of holders of shares of the associations called "building and loan associations." These latter make fixed payments for an indefinite period, the money received by the association from a group of stockholders is put together and invested, and the interest, together with some fees, withdrawal discounts, fines and forfeitures for non-payment of dues are added to the common fund, which itself is invested until such time, longer or shorter, as there is enough in the fund to pay each stockholder the par value of his shares. Stockholders who borrow from the association assign their shares as collateral, and in addition give additional security for the loan. The interest they pay goes into the common fund, of which they and all other stockholders who continue to pay their dues have a share.

The duties, rights and privileges of holders of bonds of the insolvent company are with respect to the question of equitable set-off here raised, the same as those of holders of shares of stock in a loan association. In each there is an adventure undertaken with the hope of profit and each contributes to a fund amounts which may be inequal, and in which fund each has an interest equal not to his payments to it, but to the number of payments he makes according to his contract. The adventure is the same for those who borrow money from the company, and those who do not. But those who borrow have already received part of the money due them at maturity.

The fact that the borrowing bondholders gave no security other than an assignment of the bonds does not distinguish this from a loan association, where stockholders who borrow give other collateral; nor is there any difference in principle whether the contract be called a bond, or certificate of stock. The essential features are the same.

It has been held by the Superior Court of this State, in two decisions, that the holder of shares of stock of a loan association such as has been described, is in case of the insolvency of the association, chargeable with the whole of the debt and interest. *Trustees of Mutual Loan Ass'n. v. Tyre*, 3 *Boyce* 88, 81 *Atl.* 48; *Trustees of Mutual Loan Ass'n. v. Parsons*, 3 *Boyce* 131, 80 *Atl.* 1062. In the former case the liquidating trustees of a dissolved insolvent loan association brought suit on a mortgage given by a holder of immatured stock of the association, and under a plea of payment the defendant offered to show payments made on his stock and of interest in excess of the mortgage debt, and asked that these payments be credited on account of and in discharge of the debt. But the court held otherwise, because stockholders in a loan association bear the same relation to the company, and enter into contracts of subscription of the same force and obligation as do stockholders in other corporations. The court (3 *Boyce*, at *page* 94, 81 *Atl.* at *page* 51) said:

"One who enters into the contract of a shareholder retains the status of a shareholder whether he thereafter becomes a borrower or not, and if he becomes a borrower his character as shareholder is not blended with that of borrower, but remains separate and distinct, although his stock may be assigned to the association as collateral for the loan. Primarily, the mortgage given for a loan pledges the property thereby secured for the payment of the dues upon the stock as well as the debt created by the loan, while stock·is issued upon a contract of subscription that is silent as to an obligation for money borrowed, and has no relation to such an obligation except as it may thereafter be assigned as collateral to secure its payment. In subscribing for stock in a loan association, each stockholder partakes of the adventure with the hope of profit, and each takes the same hazard and risks the same money in seeking that profit, whether he be a non-borrowing stockholder who first pays his dues and then gets his profits, or a borrowing stockholder who by a loan first takes his profits and then

FELL vs. SECURITIES CO. OF N. A. 45

Opinion.

pays his dues with the hope that upon the maturity of his stock his obligation will be returned to him canceled.

"Equality of opportunity carries equality of responsibility, and if loss instead of profit comes, it is difficult to see why a non-borrowing stockholder should yield a part of his property to reimburse his equally unfortunate fellow stockholder who happened to be a debtor to the association for money borrowed from it. The stock status of each being the same, it is therefore held by the weight of authority, that payments on stock are not *ipso facto* payments on a mortgage debt, and that dues paid on stock do not *ipso facto* work a *pro tanto* extinguishment of the mortgage (*Link v. G. B. Ass'n*, 89 *Pa.* 15), even when assigned as collateral (*Economy B. Ass'n v. Hungerbuehler*, 93 *Pa.* 258), for it is a general doctrine of the law that payments on account of collaterals are not payments on account of the debt they secure (*Lord v. Ocean Bank*, 20 *Pa.* 386, 59 *Am. Dec.* 728)."

The court charged the mortgagor with the full amount of his debt to the date of the dissolution of the association, and credited him with all payments on account of interest, but with none made on account of the stock.

In the latter of the cases cited, the same principle was applied.

In the case of *Thayer v. National Real Estate Trust Co.*, 10 *Del.Ch.*243, 97 *Atl.*604, in the Court of Chancery for New Castle County, there was a plan somewhat similar to that of the insolvent corporation. There some of those who paid installments on their shares of stock borrowed money from the company, and they were charged with interest on their debts to the date of the receivership; and in the distribution every sum borrowed by certificate holders was added to the assets and so divided, the amount of the debts due to the company from each borrowing certificate holder being deducted from his share of the assets. The question was not argued by counsel in that case, but the ruling was based on the same principle as that stated by the Superior Court in the cases cited above.

With these precedents, and being convinced that the reasons therein stated are sound and applicable here, I hold that the petitioner is not entitled to have the set-off claimed, and is not entitled to have the moneys paid in on the bond set off against the debt which she owes the company, being the money borrowed from it by her.