WILLIAM F. FELL,

*vs.*

SECURITIES COMPANY OF NORTH AMERICA.

*New Castle, Feb.* 8, 1916.

Where, as between bondholders who borrowed money from the company and those who did not, there was a common venture as to a profit fund, the amount thereof for distribution among the bondholders being dependent upon various things, the borrowing bondholders were not entitled to an equitable set-off in receivership proceedings.

Where the general reserve fund of a company was created and maintained for the redemption or payment of its bonds as they severally matured, because the company had agreed with the bondholders to do so in unmistakable terms, the bondholders, though the company paid interest, were entitled to have the fund applied to their claims alone against the assets of the company, in receivership proceedings upon dissolution.

Where the affairs of a corporation are being wound up by a receiver, the latter may terminate executory contracts, existing at his appointment, without increasing the liability of the estate by reason of a further non-performance.

Where a company, has prior to the appointment of a receiver broken its executory contract, the injured party is not deprived of his rights to a remedy for the breach as against the assets of the company in the hands of the receiver.

Where an investment company issued bonds agreeing to use the money received in monthly payments therefor so as to be able to pay the bonds at maturity, and also pay profits, if any were derived from certain sources, the bondholders' measure of damages, under the circumstances, upon the company's breach and insolvency, is the amount paid by them, with legal interest from the time of payment.

Where an investment company issued bonds, agreeing with all the holders to use the money received so as to be able to pay the bonds at maturity, and also, with several classes of holders, to pay, not only the face of the bonds at maturity, but also an additional sum equal to the interest on each installment of payment at varying percentages, upon the company's breach of the bonds and insolvency all bondholders will be

treated alike, and each repaid what he paid, with interest at six per cent. on each sum from the time of payment.

Bondholders of an investment company, which undertook to maintain a reserve fund to insure payment of the bonds at maturity, who were entitled to a preference in the company's reserve fund, upon dissolution and receivership are also entitled to participate for the payment of the balance of their claims as general creditors with others in the general assets of the company, outside the reserve fund, having the full claim of each considered, and not its amount less that received from the reserve.

EXCEPTIONS TO CLAIMS. The Securities Company of North America was incoprorated in August, 1904, under the laws of Delaware for the purpose of engaging in the business of making contracts with individuals, which were evidenced by bonds or certificates of three classes. The holders of the bonds or certificates agreed to make periodical payments to the company, in consideration of which the company agreed to pay a definite sum of money, together with a share of all accumulations of profit, at maturity of the contract. In September, 1915, the company was voluntarily dissolved in the manner provided by statute, and the Wilmington Trust Company was appointed receiver to wind up its affairs. The general indebtedness amounted to a very small sum, and the claims filed were based almost wholly on the various forms of bonds or certificates issued by the company, to which exceptions were filed in order to determine the priority of claims.

The cause was heard on the claims and exceptions, and the facts are sufficiently stated in the opinion.

*Ward, Gray* and *Neary*, for the receiver, the exceptant. *Caleb S. Layton*, for the claimants.

THE CHANCELLOR. The question raised for consideration by the exceptions taken by the receiver to the claims of the holders of contracts made by the company are not affected by the claims of general creditors, for they have been paid, or can be paid from moneys of the company constituting its capital, and not obtained from holders of these contracts. So also the expenses of the liquidation of the company through the receiver

upon the dissolution of the company may, it seems, be met from the same source, and it will probably not be necessary to consider whether any part of the reserve fund should be used to pay such expenses.

There is, therefore, a fund called the reserve fund, against which these contract holders have filed claims, and it is urged that they are entitled to have it divided among them alone. As it is not sufficient to pay them all in full, according to any suggested method of calculating the amount of their claims, especially the claims for interest, it would be an academic question and not a practical one, but for the fact that the capital stock of the company is not fully paid and probably the shareholders may be required to make further payment of their subscriptions to stock because the reserve fund is inadequate to pay the holders of contracts under certain constructions of their rights under present conditions.

The bonds of class A, including A1, A2, A3 and A4, have a common feature, viz: The company undertook to maintain a reserve fund to insure the payment of the bonds at maturity. It undertook to set apart whatever amount was necessary for the purpose. In effect it said to each bondholder: You cannot lose, for by mathematical calculation it has been ascertained that by setting aside in a fund a certain part of the money you and the holders of other bonds pay, and by investing the fund to yield even three per cent. interest, and by compounding that interest even at that rate, there will surely be enough at maturity of your bond to pay you the fixed amount which the company agreed to pay at that time, and further this fund either belongs to the bondholders exclusively, or is so pledged for their benefit as that it is in effect a trust fund, the company being trustee and you the beneficiary.

This is the ultimate principle in all of the clauses relating to the reserve fund. There is some difference in the wording of the reserve clause in the several kinds of contracts, but they are alike in principle. Even those bonds designated as class A4, which do not contain the phrase, "which reserve shall belong exclusively to this bond," are to be construed to have established a redemption fund, sinking fund, or reserve fund

for the exclusive benefit of bondholders.    But the bonds belonging to class A3 have an additional phrase which the other three subdivisions of bonds of class A do not contain.    By class A3 bonds the company agreed not only to maintain a reserve or redemption fund, in substance like the other bonds of class A, and to pay a certain sum at a fixed date, but also ageed to pay at that fixed date, interest at the rate of four per centum per annum on the installments which it should receive from bondholders of class A3.

Holders of all of the class A bonds were also given an interest in another fund called the "Profit Fund," made up of certain gains, such for instance as discounts, fees for transfers, fines for delay in payments by bondholders and forfeits.    This fund necessarily uncertain in amount was payable to the bondholders at the maturity of their bonds, the company simply agreeing to pay a share thereof as determined by the company. But bonds of class A2 and A4 contained definite agreements as to the minimum amount to be paid at maturity to bondholders as their interest in the "Profit Fund."    To holders of class A2 bonds the company agreed that their share of the profit fund would not be less than three per centum per annum upon installments paid by the bondholders respectively, and to holders of class A4 bonds, the company guaranteed that their share of the profit fund would be not less than four per centum upon the payments it received from the bondholders respectively.

The charter of the company has no bearing on the questions here raised.

To understand the problems presented, explanation should be made of the plan adopted by the company for carrying out its undertaking to set apart a portion of the moneys it should receive from the holders of bonds to provide by compounding interest annually at three per centum a fund called "Reserve Fund" for the payment at maturity of the principal sum named in the bond.    The plan was to use for the general expenses of the company the whole of the first six payments made by each bondholder and nine per centum of each of the other payments, and it was calculated that ninety-one per  centum of all such payments except the first six of them, if compounded annually

at three per cent. would equal the principal sum payable to the respective bondholders at the maturity of their several bonds.

Notwithstanding the fact that as to this "Reserve Fund" holders of bonds of class A3 had a right different from and larger than the holders of other bonds of class A, and notwithstanding it may have been the duty of the company to have kept the "Reserve Fund" for some kinds of bonds of class A separate from the "Reserve Fund" for the others; still as a fact no reserve fund was maintained by the company for any particular bond, or subvidision of bonds of class A, but all sums taken from the payments made by all bondholders of class A were placed in a general reserve fund, which on its books the company called "Reserve Class A." The company also by its books maintained accounts called "Reserve Class B" and "Reserve Class C," as referring to bonds of class B and class C. But there was no actual separation of the moneys applicable to these several funds, all of the moneys of the company being commingled in one general bank account. This may not be an important fact.

According to the books of the company no part of "Reserve B" or "Reserve C" was invested in the securities held by the company at the time of its dissolution.

Of the capital of the company, *i. e.*, the $50,000 received from shareholders, being fifty per centum of the par value thereof, about $10,000 is gone and $36,000 was invested separately and called "Capital Investment Account." There was about $4,000 in the cash account. The company did not undertake to have a separate reserve fund for each particular bond, for obviously its business, and the success of its undertakings with each bondholder, contemplated that there would be other similar bonds taken by other persons and the more the better.

Speaking generally, the plan as to bondholders respecting the reserve fund as such was not co-operative; that is to say, the company assumed to each a defininte obligation to pay a certain sum at a certain time. As between bondholders who borrowed money from the company and those who did not there was a common venture as to the "Profit Fund," the

106    FELL vs. SECURITIES CO. OF N. A.

Opinion.

amount thereof for distribution being dependent on various things, so that, as has been heretofore held in this court, the borrowing bondholders are not entitled to an equitable set-off. See *ante p.* 38, 95 *Atl.* 346.

So far as concerns the rights of the bondholders to have the general reserve fund which the company by its books kept for the benefit of its bondholders applied to their claims against the assets of the company, it is quite immaterial whether it be called a trust fund or not. It was created and maintained for the redemption, or payment, of the bonds when and as they severally matured, and this was done because the company agreed to do so in unmistakable terms. As was said in the opinion in this court in administering the affairs of the National Real Estate Trust Company by a receiver:

"This obligation of the company to keep this fund intact impresses the fund with a trust in favor of the holders of thrift certificates, and none others are entitled to participate in a distribution thereof." *Thayer v. National Real Estate Trust Co.*, 10 *Del. Ch.* 243, 250, 97 *Atl.* 604.

In that case the holders of thrift certificates were in like position with the bondholders here, and the difference in the words of the two obligations differed only in the degree of emphasis of the duty of the company to segregate part of its receipts for the ultimate redemption of its promises made to those with whom it had made contracts. I fail to see the force, or even pertinency, of the payment by the company of interest as affecting the above point.

Having concluded, then, that the holders of bonds have a preferred claim on the assets of the company constituting the general reserve fund maintained by the company, the method of distribution is not so clear.

Here the company, finding itself unable to proceed in its chosen business, ceased operation, was dissolved by the action of its directors, officers and stockholders, and its affairs are now being wound up by a receiver. As a result it cannot fulfill its contract obligations to its bondholders. All this occurred before the receiver was appointed. Under some circumstances a receiver may terminate executory contracts existing at his

appointment without increasing the liability of the estate by reason of a further non-performance of the contract. *Du Pont v. Standard Arms Co.*, 9 *Del. Ch.* 315, 81 *Atl.* 1089. But where the company for which he was appointed receiver has prior to the appointment broken its contract, the injured party is not deprived of his rights to a remedy for the breach as against the assets of the company in the hands of the receiver. This principle has been stated thus:

"Where the breach of contract by reason of the insolvency of the corporation occurs before any intervention of the law, it is held that the creditors may stand upon the breach, and upon dissolution or winding up proceedings the broken contracts must be treated as they are found." 34 *Cyc.* 266.

What is the measure of damages which the bondholders could have recovered against the company had no receiver been appointed, or dissolution taken place? The bondholders had a right to have the company continue its undertaking. *People v. Security Life Ins., etc., Co.*, 78 *N. Y.* 114, 125, 34 *Am Rep.* 522. It was the duty of the company to receive payments on the bonds, and so use the money according to its contract as to be able to pay the bonds at maturity, and also pay profits if any be derived from certain designated sources. It has failed in its undertaking. If it were possible to do so the damages would be based on what the bondholders would have received had they paid and the company done its contract duty. But this is manifestly impossible. There are too many factors and contingencies to be considered.

If all the bonds were alike in their terms the simple and equitable rule would be to refund to the bondholders the amounts paid by them to the company with interest at the legal rate from the times of each payment. By this method each bondholder would be reimbursed as fully as any court could do short of working out through the receiver the plan of procedure adopted by the company, which is, of course, impossible. Interest would be compensation for being deprived of the use of the money paid to the company for a proper but impracticable purpose and would be a fair measure of damages for the

failure of the company to complete its contracts. At least it would effect a restoration to the bondholders of what they paid with compensation for the loss of the use of the money paid. It is not claimed that this method is based on adjudicated precedents, nor because it is a simple and easily applied method, but because under the circumstances it seems to be based on substantial justice by making reparation to the fullest extent practicable.

It appears, however, that by some of the bonds the company agreed to pay not only the face of the bond at maturity, but also an additional sum equal to interest on each installment from the time of paying it, some at three per centum and others at four per centum per annum, and on some other bonds agreed that the bond's share of the profit fund would be not less than four per centum per annum upon the payments made by the bondholders. All of these engagements are broken.

Inasmuch as the whole scheme of the company has fallen through, all the bondholders should be treated alike, whether their bonds contained the additional features just alluded to or not. None of the bond contracts can be carried out, and so all should stand alike, and if each be repaid what he paid to the company with interest at six per centum on each sum from the time of payment an equality among unfortunates, none of whom can be given a fulfillment of their contracts, will be observed.

It has been suggested that as the company expected to carry out its plan of redemption by investing ninety-one per cent. of each installment paid, except the first six payments, that this with three per cent. interest compounded should be the measure of payments to bondholders. Force is given to this by the express undertaking of the company to have a redemption fund by so using such portion of each installment as with interest thereon at three per cent. compounded would yield a sum equal to each bond. But the error of this theory of compensation is that the promise of the company depends on performance by the bondholders, and it is as impossible for the receiver to work out the scheme as it was for the company to do it, even if this court would authorize the attempt.

Inasmuch, therefore, as all bondholders must lose, and none can have his contract fulfilled, all must be treated alike so far as the distribution of the "Reserve Fund" is concerned, and each be allowed a claim for each installment paid, with six per cent. interest from payment to date of the receivership. This will apply to all of the bonds of class A, whether in the proofs of claims the preference is claimed, or not; for manifestly if all in the same class of creditors are entitled to such advantage under the contracts, they should be treated alike, even though there is a rule of court which requires that the preference be claimed, for the circumstances are unusual.

It is also clear that after the reserve fund has been so distributed to the bondholders, they will be entitled to participate for the payment of the balance of their claims as general creditors, with other general creditors, if any, in the general assets of the company outside the investments of the reserve (*Bank Com'rs. v. Security Trust Co.*, 75 *N. H.* 107, 71 *Atl.* 377); and in so doing the full claim of each shall be considered and not the full claim less the amount received from the reserve fund, though they will not be entitled to receive more than the whole claim.

To the extent hereinabove indicated the exceptions taken by the receiver will be sustained.

Let an order be entered accordingly.